John Snow, Nevada Bar No. 4133
VANCOTT, BAGLEY, CORNWALL & McCARTHY
2300 West Sahara Avenue, Suite 800
Las Vegas, NV 89102
Telephone:     (801) 532-3333
Facsimile:      (801) 534-0058
Email:          jsnow@vancott.com

John Burton, CA State Bar No. 86029
THE LAW OFFICES OF JOHN BURTON
414 South Marengo Avenue
Pasadena, CA 91101
Telephone:     (626) 449-8300
Facsimile:      (626) 449-4417
E-mail:         jb@johnburtonlaw.com

Peter M. Williamson, CA State Bar No. 97309
WILLIAMSON & KRAUSS
21800 Oxnard Street, Suite 305
Woodland Hills, CA 91367
E-mail:         pmw@williamson-krauss.com
Telephone:     (818) 226-5700
Facsimile:      (818) 226-5704
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| RANDY RICH, as personal representative of RYAN RICH, deceased, and NICK JENSEN and TANYA JENSEN as Guardians for R.J., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>TASER INTERNATIONAL, INC., and DOES 1 to 10, inclusive,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>[DEMAND FOR JURY TRIAL] |

93319v.1

Attorneys for plaintiffs, RANDY RICH as the personal representative of RYAN RICH, deceased, and NICK JENSEN and TANYA JENSEN, as Guardians for R. J., a minor, allege as follows:

## JURISDICTION

1.      Jurisdiction for the state law tort claims against all Defendants is pursuant to the statutes of the State of Nevada and is conferred upon this Court by the doctrine of pendent jurisdiction pursuant to 28 U.S.C. § 1367.

2.      The claims against TASER International, Inc., (hereinafter "TASER") are both within the supplemental jurisdiction of the Court and because of diversity of citizenship, pursuant to 28 U.S.C. § 1332.

## VENUE

3.      Plaintiffs' claims herein arise out of an incident involving a Nevada Highway Patrol officer, in the City of Las Vegas, County of Clark, State of Nevada, and within this judicial district, pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.      Plaintiff Randy Rich is a competent adult who appears as the personal representative of Ryan Rich, deceased.

5.      Plaintiffs Nick Jensen and Tanya Jensen ("Jensen's") are competent adults who have been appointed by the Court, Davis County, Utah, as Guardians for their daughter R.J., a minor. The Jensen's have, in addition, filed a Petition with this Court to have said guardianship

93319v.1

recognized for the purposes of this proceeding.

6.   At all times herein mentioned, Defendant TASER International, Inc. (hereinafter "TASER"), was a Delaware Corporation with its principle place of business in the State of Arizona and at all times relevant hereto, was doing business in the County of Clark, State of Nevada.   As alleged herein TASER negligently, defectively, and fraudulently designed, manufactured, failed to warn, misrepresented and/or concealed the fact that its 26-watt Electronic Control Devices (herein after "ECDs") were defective and unreasonably dangerous, and as a legal cause of said acts and omissions Ryan Rich was repeatedly shocked with a TASER Model X26 ECD causing ventricular fibrillation (herein after "VF"), cardiac arrest, and death.

7.   Plaintiffs are ignorant of the true names and capacities of those defendants sued herein as DOES 1 through 10, inclusive, and for that reason have sued such defendants by fictitious names. Plaintiffs will seek leave of  court to amend this complaint to identify said defendants when their true names and identities are ascertained. Plaintiffs are  informed and believe, and on that basis allege, that each of the fictitiously named defendants is in some fashion liable and legally responsible for the damages and injuries set forth herein.

8.   In doing the things alleged hereinafter, defendants, and each of them, acted as the agents, servants and employees of their co-defendants, acted within the course and scope of said agency and employment, and with the knowledge, consent and approval of the co-defendants, and their conduct was ratified by each of the other co-defendants.

9.   At all times herein mentioned, Defendant TASER was acting through its officers, directors and supervisory managers in performing the acts, omissions, misrepresentations, and

3

93319v.1

concealments of material fact alleged herein. Said officers, directors, and supervisory managers had knowledge of in advance, ratified, and/or otherwise authorized all of the acts, omissions, misrepresentations and concealments of material fact alleged herein which were the legal cause of the death of Ryan Rich.

## FACTS

A.   **Allegations Regarding the Death of Ryan Rich**

10.    Plaintiffs hereby incorporate by reference paragraphs 1 through 9 herein, as if set forth in full.

11.    On or about January 4, 2007, Decedent Ryan Rich was a thirty-three (33) year old single father with a brief history of seizure disorders, who was 6'2" tall and weighed approximately two hundred and twenty pounds (220 lbs.).

12.    On January 4, 2007, Ryan Rich, a licensed physician and emergency room resident, was on his way to his place of employment at Spring Valley Hospital.   As he was driving on Interstate-15, Dr. Rich suffered a seizure which rendered him dazed, confused and disoriented.   He was unable to control the pick-up truck he was driving and as a result was involved in several minor traffic collisions.  Ultimately, Dr. Rich was able to stop his truck next to the center divider of the highway.

13.    Dr. Rich's erratic driving was observed by Nevada Highway Patrol Officer Loren Lazoff, who promptly pulled his patrol vehicle behind Dr. Rich's truck.   Officer Lazoff approached Dr. Rich's truck from the rear until he was adjacent to the passenger- side front widow. The widow was closed.   Officer Lazoff ordered Dr. Rich to exit the truck.   However,

93319v.1

Dr. Rich was still dazed, confused and disoriented.   He sat completely still in the driver's seat staring straight ahead and said nothing.   Officer Lazoff yelled a second time for Dr. Rich to exit the truck but, again, Dr. Rich failed to respond.  Dr. Rich was not combative, violent and posed no threat to Officer Lazoff who remained standing adjacent to the passenger-side front window of Rich's truck

14.   After several commands to exit the truck were given, Officer Lazoff took his baton and broke the passenger-side front window of the truck.  He first attempted to shift the car out of gear but was unsuccessful.  He then grabbed Dr. Rich's keys, which were still in the ignition, and turned the engine office.   He then ordered Dr. Rich to get out of the truck.

15.   Dr. Rich complied with Officer Lazoff's command to exit the truck by getting on all fours and moving across the bench seat towards the passenger front door.  Officer Lazoff attempted to handcuff Dr. Rich by grabbing the cuff of his left wrist but Dr. Rich pulled his arm back.  A struggle ensued at which time Dr. Rich was pulled out of the truck landing on his back on the pavement next to the truck.

16.   While grabbing Dr. Rich's right arm, Officer Lazoff attempted to handcuff him but Dr. Rich continued to resist, pulling away from the officer's grasp.  He got to his feet and began to run in the direction of the traffic lanes.  In an effort to bring Dr. Rich under control, Officer Lazoff grabbed the back of Dr. Rich's shirt and discharged his TASER Model X26 Electronic Control Device ("ECD") from a distance of approximately 3-4 feet directly into the chest of Dr. Rich.   The ECD discharge subjects Dr. Rich to 50,000 volts of electricity for a full 5-second cycle.  Dr. Rich is then subjected to a second 5-second ECD cycle to the chest.

5

93319v.1

17.     As Dr. Rich attempts to remove the ECD probes from his chest, Officer Lazoff discharges his ECD for a third 5-second cycle. The ECD discharge is sufficient to cause Dr. Rich to fall back to the ground. Officer Lazoff guides Dr. Rich to the ground and turns him on his stomach in an effort to complete the handcuffing process.

18.     After the completion of the third 5-second ECD cycle, Dr. Rich began to move his legs. Officer Lazoff then applied his ECD in drive stun mode to the outer portion of Dr. Rich's right thigh for an additional 5-second cycle. Dr. Rich continued to move his legs so Officer Lazoff discharged his ECD a second time in drive stun mode to Dr. Rich's thigh. Dr. Rich's legs straighten in response. With the help of a passerby, Officer Lazoff is then able to complete the handcuffing process.

19.     In total, Dr. Rich was subjected to five, 5-second ECD cycles, three in probe mode directly to the chest and two in drive stun mode to the outer portion of the right thigh.

20.     After the fifth and final ECD discharge, Officer Lazoff walked back to his patrol vehicle to call for an ambulance. While in the process of placing the call using his patrol vehicle radio, the passerby that assisted in the handcuffing process informed him that Dr. Rich was turning blue. According to Officer Lazoff, approximately 20-seconds elapsed between the completion of the handcuffing process and his notification by the passerby that Dr. Rich was turning blue.

21.     In response to Officer Lazoff's call, paramedics eventually arrived at the scene and transported Dr. Rich to Spring Valley Hospital where he was pronounced dead a short time later.

93319v.1

**B.      General Allegations Against TASER, International**

22.      Prior to January 4, 2007, Plaintiffs are informed and believe that Defendant TASER had misrepresented, failed to disclose and/or failed to warn the Nevada Highway Patrol and the officers on the scene of the following material facts, among others:

(a)      Falsely represented that its 26-watt ECDs are not lethal;   (See, e.g., Version 12 and 13 TASER Training Materials);

(b)      Falsely represented that the its 26-watt ECDs cannot cause cardiac arrest; (See, e.g., Version 12 and 13 TASER Training Materials);

(c)      Falsely represented that its 26-watt ECDs cannot cause ventricular fibrillation; (See, e.g., Version 12 and 13 TASER Training Materials);

(d)      Falsely represented that a TASER 26-watt ECD can be safely fired at the front center of a suspect's body mass; (See, e.g., Version 12 and 13 TASER Training Materials);

(e)      Falsely represented that "after initially deploying the TASER X26 upon the suspect, a law enforcement officer should be prepared to deliver additional cycles." (See, e.g., Version 13 TASER X26 Certification Test, 07-06-06);

(f)      Falsely represented that multiple ECD discharges into a human being presents no greater health risk than a single discharge;  (See, e.g., Version 12 and 13 TASER Training Materials);

(g)      Falsely represented that a TASER 26-watt ECD affects the sensory and motor nervous systems, but cannot affect the cardiac system of a suspect (See, e.g., Version 13

7

93319v.1

TASER X26 Certification Test);

(h)     Failed to disclose and/or warn that a TASER 26-watt ECD is a potentially lethal device which can cause ventricular fibrillation and cardiac arrest;

(i)     Failed to disclose and/or warn that the risk of ventricular fibrillation and cardiac arrest is significantly increased by discharging an ECD in the front chest, near the heart especially where the suspect has a relatively thin body type, as was Decedent RICH – and that law enforcement including the Nevada Highway Patrol should endeavor to deploy the ECDs to parts of a suspects body other than the front of the chest to minimize or eliminate the risk of cardiac arrest and death;

(j)     Failed to disclose and/or warn that the Nevada Highway Patrol and other law enforcement agencies should carry defibrillators in their police vehicles if personnel are armed with 26-watt ECDs in order to further minimize the risk of brain damage or death in the event cardiac arrest occurs from ECD use;

(k)     Failed to disclose and/or warn that multiple cycles and uses of ECDs on a single person increase the risk of ventricular fibrillation, cardiac arrest, and death which Decedent RICH suffered.

(l)     Falsely represented in Instructor notes to the slide on "the decision to deploy" that "When used within the design parameters of the device, the TASER is a very effective, non-lethal, control device," when it is in fact potentially lethal. (See, e.g. Version 12 Training Manual, issued January, 2005.)

(m)     Falsely represented that "There is no medical evidence that the TASER T-

Waves™ in any way causes or contribute to heart or respiratory failure." (See, e.g. Version 12 Training Manual, issued January, 2005.)

(n)     Falsely represented, concealed and failed to warn that "TASER applications directly across the chest may cause sufficient muscle contractions to impair normal breathing patterns. While this is not a significant concern for short (5 sec) exposure, it may be a more relevant concern for extended duration applications. Accordingly, prolonged applications should be avoided where practicable." There is no mention of the risk of VF, which increases with prolonged exposure and is much more life threatening than temporary impairment of respiration. (See, e.g. Version 12 Training Manual, issued January, 2005.)

(o)     TASER falsely trains that officers should "Keep cycle going until suspect restrained,"despite the risk of inducing VF if the probes are deployed across the chest. (See, e.g. Version 12 Training Manual, issued January, 2005.)

(p)     In TASER's Medical Safety Slide Training Version 12 TASER falsely represented that:

The ADVANCED TASER M26 was applied directly to the chest of experimental animals without causing heart failure during tests at the University of Missouri;

•     Using "worst case" scenarios, cardiac safety experts found no induction by the M26 weapon of abnormal heart rhythms;

No arrhythmia provocation occurred even when the animals were given the stimulant drugs epinephrine and isoprotemol, agents that make

93319v.1

the heart more susceptible to electrical stimulation; "there are no lasting after-effects from the electrical current itself." (Instructor notes to slide on "Possible TASER side effects"); and

- "Extensive animal testing has shown effect on heart rhythms or blood pressure to be insignificant." (TASER Technology Medical Safety Slide)

(q)    In the Version 12 Lesson plan, page 91 (dated 11/04), Defendant TASER falsely misrepresented that: "Unlike aerosol chemical agents, the entire body is effective target zone," and there is no mention of increase VF risk from strikes to the chest; and then again at page 92, in connection with one incident, Defendant TASER points out that an officer "Aimed at open front of unzipped jacket."

23.    Plaintiffs are informed and believe that because of Defendants' tortuous conduct as alleged herein, the Nevada Highway Patrol officer at the scene deployed and discharged a TASER Model X26 ECD to the front of Decedent RICH's chest with one of the two prongs deployed in dose proximity to Decedent RICH's heart. This ECD deployment by the Nevada Highway Patrol officer at the scene was done by the officer in a foreseeable manner, and in the manner intended by Defendant TASER. At all times herein mentioned, the Nevada Highway Patrol and the officer at the scene was unaware and had been tricked and deceived that his use of the ECD could not cause cardiac arrest by the misrepresentations, concealments of material fact and failures to warn by Defendant TASER described herein above.

24.    The Nevada Highway Patrol officer at the scene discharged a TASER Model X26

1 0

ECD into Decedent RICH multiple times. Decedent RICH immediately suffered ventricular fibrillation and cardiac arrest. Decedent RICH's heart stopped pumping blood to his brain, and he suffered severe brain injury as a result of a lack of oxygen over a period of a number of minutes. Paramedics were called to the scene but were unable to revive the decedent and he died a short time later.

25.     At all times herein mentioned, Defendant TASER was aware and knew or should have known that its 26-watt ECDs are potential lethal devices which could cause direct ventricular fibrillation and cardiac arrest, to subjects like Decedent RICH when it was used by law enforcement in its intended manner.

26.     At all times herein mentioned, Defendant TASER has used its best efforts to avoid performing or encouraging objective medical and scientific studies which would prove the dangerousness and lethality of 26-watt ECDs as described above. Instead, Defendant TASER has ignored the medical and scientific literature, and the opinions of the objective, unbiased medical and scientific community, and has misrepresented and twisted medical and scientific research in order to deceive law enforcement and the general public to increase Defendant TASER'S profits at the expense of serious, permanent injury and death to members of the public.

27.     Plaintiffs are informed and believe that instead of investing in pre-market and post-market objective, unbiased medical and scientific research regarding the dangers of its 26-watt ECDs, Defendant TASER has devoted large sums of money to an intentional and/or false marketing campaign designed to mislead and deceive the general public and the law enforcement community into believing that such weapon systems are non-lethal, and cannot cause ventricular

93319v.1

fibrillation or cardiac arrest.

28.   Plaintiffs are informed and believe that the Nevada Highway Patrol officer at the scene had been trained in the use of the TASER Model X26 ECD by CD, oral and written instruction, training, warnings, and other methods provided directly or indirectly to the Nevada Highway Patrol by Defendant, TASER.

**C.   Allegations Regarding Damages**

29.   Plaintiffs have lost support, decedent's love, comfort and society, and have sustained emotional distress, all in amounts in accordance with proof. Plaintiffs have incurred burial and other related expenses. The decedent sustained general damages, including the loss of enjoyment of his life, in an amount in accordance with proof but in excess of $75,000.00.

30.   The conduct of the defendants, and each of them, was willful, malicious, oppressive and in reckless disregard for the rights and safety of plaintiffs and the decedent himself, thus justifying punitive damages against said defendant in an amount in accordance with proof.

## FIRST CAUSE OF ACTION

### (NEGLIGENCE)

31.   Plaintiffs hereby incorporate by reference paragraphs 1 through 30 herein, as if set forth in full.

32.   At all times herein mentioned, Defendants, and each of them, were engaged in the business and profession of designing, manufacturing, selling, distributing, fabricating, assembling, buying, inspecting, testing, servicing, repairing, marketing, warranting, instructing,

93319v.1

and advertising 26-watt ECDs which these defendants knew, or in the exercise of reasonable care should have known, would be used without inspection for defects or dangers in their parts, mechanisms or design. Defendants' product was unreasonably dangerous and defective for use on human beings because, among other things, it was negligently designed, manufactured, and was sold without warnings of the risks and dangers described herein above.

33. At all times herein mentioned, Defendant TASER and the DOE Defendants negligently and carelessly designed, manufactured, sold, distributed, fabricated, assembled, bought, inspected, altered, maintained, serviced, tested, repaired, marketed, warranted, instructed, and advertised their unreasonably dangerous defective product in that Defendant TASER knew or should have known that the device was capable of causing, and did in fact cause, personal injuries and death to persons while being used in a manner reasonably foreseeable, thereby rendering the product unsafe and dangerous for its intended use.

34. Defendant TASER'S Model X26 ECD was the legal cause of Decedent RICH's death as described above, and Plaintiffs have suffered economic and non-economic damages in an amount to be awarded according to proof.

35. Plaintiffs are informed and believe and thereon allege that Defendants TASER, and said DOE Defendants, acted in a despicable, malicious, oppressive and fraudulent manner, in conscious disregard of the rights and safety of Decedent RICH, entitling Plaintiffs to recover exemplary and punitive damages in an amount to be awarded according to proof.

93319v.1

## SECOND CAUSE OF ACTION

### (STRICT PRODUCT LIABILITY)

36.     Plaintiffs hereby incorporate by reference paragraphs 1 through 35 herein, as if set forth in full.

37.     Defendants, and each of them, designed, manufactured, sold, distributed fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the subject device which contained design defects, manufacturing defects and/or defects as a result of a failure to warn which were capable of causing, and in fact did cause, personal injuries to people like Decedent RICH when used in a manner reasonably foreseeable, thereby rendering TASER ECDs as unsafe and dangerous for their intended use.

38.     As a proximate result of the above-described defects in the subject product, Plaintiffs sustained economic and non-economic damages in an amount to be awarded according to proof.

39.     Plaintiffs are informed and believe and thereon allege that Defendant TASER and said DOE Defendants acted in a despicable, malicious, oppressive and fraudulent manner, in conscious disregard of the rights and safety of Decedent RICH, such that Plaintiffs are entitled to exemplary and punitive damages in an amount to be awarded at trial.

## THIRD CAUSE OF ACTION

### (INTENTIONAL MISREPRESENTATION)

40.     Plaintiffs hereby incorporate by reference paragraphs 1 through 39 herein, as if set forth in full.

14

93319v.1

41.     Defendant TASER represented to the Nevada Highway Patrol all of the material statements set for herein above, including those set forth in paragraph 22.

42.     These representation were in fact false. Defendant TASER knew that the misrepresentations were false when it made them, and/or made the representations recklessly and without regard for their truth.

43.     Defendant TASER intended that law enforcement agencies such as the Nevada Highway Patrol rely on the misrepresentation, and in fact, the Nevada Highway Patrol did rely on these misrepresentations in purchasing, deploying, training, instructing, and otherwise using TASER manufactured ECDs as a law enforcement tool in  interacting with members of the public such as Decedent RICH.

44.     As a legal result of Defendant TASER's misrepresentations, Plaintiffs suffered economic and non-economic damages as described above.

45.     Defendant TASER'S intentional misrepresentations were malicious, oppressive and fraudulent, and constituted despicable conduct entitling Plaintiffs to an award of exemplary and punitive damages in an amount to be awarded according to proof.

## FOURTH CAUSE OF ACTION

### (FRAUDULENT CONCEALMENT AND DECEIT)

46.     Plaintiffs hereby incorporate by reference paragraphs 1 through 45 herein, as if set forth in full.

47.  Defendant TASER intentionally failed to disclose to the Nevada Highway Patrol and other law enforcement agencies material and important facts that were known only to Defendant

93319v.1

TASER and could not have been discovered by Nevada Highway Patrol and other law enforcement agencies, all as described hereinabove. These important and material facts include, but are not limited to: that its ECDs can be in fact "lethal"; that its ECDs can and do on occasion cause ventricular fibrillation, cardiac arrest, and death; that the risk of ventricular fibrillation and cardiac arrest is significantly decreased if a person is shot with the ECD other than in the front of the chest; that to reduce the risk of death from cardiac arrest by an ECD, law enforcement officers who deploy ECDs should carry with them in their vehicles defibrillators or otherwise have defibrillators available.    Furthermore, Defendant TASER actively concealed these important material facts from the Nevada Highway Patrol and other law enforcement agencies, and/or prevented such agencies from discovering these facts. Instead, Defendant TASER disclosed partial truths about its ECDs and intentionally failed to disclose the important and material facts set forth above.

48.    At all times herein mentioned, the Nevada Highway Patrol was completely reliant upon Defendant TASER for appropriate warnings, instructions, and the necessary medical and scientific evidence so that officers of Nevada Highway Patrol could be properly trained and instructed in the use of the ECDs.

49.    The Nevada Highway Patrol and other law enforcement agencies did not know of the facts concealed by Defendant TASER.

50.    Defendant TASER intended to deceive the Nevada Highway Patrol, other law enforcement agencies, and the general public, including Plaintiffs, of the true facts.  Nevada Highway Patrol and other law enforcement agencies reasonably relied on Defendant TASER's

93319v.1

deceptions.

51.   As a legal result of Defendant TASER's concealments, Plaintiffs suffered economic and non-economic damages in an amount to be awarded according to proof.

52.   Plaintiffs are informed and believe and thereon allege that Defendants TASER, and said DOE Defendants, acted in a despicable, malicious, oppressive and fraudulent manner, in conscious disregard of the rights and safety of Decedent RICH, entitling Plaintiffs to recover exemplary and punitive damages in an amount to be awarded according to proof.

## FIFTH CAUSE OF ACTION

### (NEGLIGENT MISREPRESENTATION)

53.   Plaintiffs hereby incorporate by reference paragraphs 1 through 52 herein, as if set forth in full.

54.   Defendant TASER represented to the Nevada Highway Patrol and other law enforcement agencies important and material facts described hereinabove.

55.   These important material facts and representations were not true, and Defendant TASER had no reasonable grounds for believing that its representations were true when they were made.

56.   Defendant TASER intended that the Nevada Highway Patrol, law enforcement agencies and members of the general public, including Plaintiffs, rely on these representations, and these individuals did in fact reasonably rely on the misrepresentation.

57.   As a legal result of Defendant TASER'S misrepresentations, Plaintiffs suffered economic and non-economic damages in an amount to be awarded according to proof.

17

93319v.1

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

      (1)    For economic and non-economic damages in an amount to be awarded according to proof;

      (2)    For punitive and exemplary damages against Defendant TASER and DOES 1 to 10 in an amount to be awarded according to proof;

      (3)    For reasonable attorneys' fees;

      (4)    For costs of suit; and

      (5)    For such other and further relief as the Court deems just and proper.

DATED: December 30, 2009

                     VANCOTT, BAGLEY, CORNWALL & McCARTHY

                     By: _____ /s/ JOHN SNOW _____
                            JOHN SNOW, Esq.
                            Attorneys for Plaintiff

93319v.1

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury pursuant to Fed. R. Civ. P. 38(b).

DATED:  December 30, 2009

VANCOTT, BAGLEY, CORNWALL & McCARTHY

By: _____ /s/ JOHN SNOW _____
JOHN SNOW, Esq.
Attorneys for Plaintiff

19

93319v.1