**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

RANDY RICH, as personal )      2:09-cv-02450-ECR-RJJ
representative of RYAN RICH, )
deceased, and NICK JENSEN and )      **Order**
TANYA JENSEN as guardians for )
R.J., a minor, )
                                      )
        Plaintiffs, )
                                      )
vs. )
                                      )
TASER INTERNATIONAL, INC., and )
DOES 1 to 10, inclusive, )
                                      )
        Defendants. )
                                      )
_____)

        Now pending before the Court is Defendant TASER International,
Inc.'s ("TASER") <u>Daubert</u> motions (## 50, 51, 52) with respect to three
of Plaintiffs' expert witnesses, motion for summary judgment (#53),
and motion to strike (#109).  The motions are ripe and we now rule on
them.

## I. Factual Background

        The complaint (#1) alleges as follows.  At the time of his
death on January 4, 2007[1], Decedent Randy Rich ("Dr. Rich") was

        [1] The complaint alleges that the events at issue occurred on
January 4, 2007, indicating that Plaintiffs missed the two-year
statute of limitations for a wrongful death suit.  <u>See</u> NEV. REV. STAT.
§ 11.190(4)(e).  However, the evidence establishes and the parties

1   thirty-three years old, 6'2" tall, and weighed approximately 220

2   pounds.  (Compl. ¶ 11 (#1).)  Dr. Rich was a licensed physician and

3   emergency room resident at Spring Valley Hospital in Las Vegas,

4   Nevada.  (Id. ¶ 12.)  Dr. Rich had a history of seizure disorders.

5   (Id. ¶ 11.)

6        On January 4, 2007, Dr. Rich was driving his pick-up truck on

7   Interstate-15 on his way to work.  (Id. ¶ 12.)  As he was driving,

8   Dr. Rich suffered a seizure which rendered him unable to control the

9   truck and resulted in several minor traffic collisions, witnessed by

10  Nevada Highway Patrol ("NHP") Officer Loren Lazoff ("Officer

11  Lazoff").  (Id. ¶¶ 12-13.)   Once the truck came to a stop next to

12  the center divider of the highway, Officer Lazoff approached Dr.

13  Rich's truck and ordered him to exit the truck.  (Id. ¶ 13.)  Dr.

14  Rich, however, was in a dazed post-seizure state and did not comply

15  with Lazoff's repeated instructions to exit the vehicle.  (Id.)

16  Officer Lazoff then broke the passenger-side window, attempted to

17  shift the truck out of gear, grabbed the keys and turned off the

18  engine, and again ordered Dr. Rich to exit the vehicle.  (Id. ¶ 14.)

19       A struggle ensued once Officer Lazoff attempted to handcuff Dr.

20  Rich through the passenger window.  (Id. ¶ 15.)  Officer Lazoff was

21  able to pull Dr. Rich out of the truck and onto his back on the

22  pavement, but Dr. Rich continued to resist being handcuffed.  (Id.

23  ¶¶ 15-16.)  At the point where Dr. Rich eluded Officer Lazoff's

24  grasp and began heading toward the traffic lanes of the highway,

25  _____

26  assert in their respective motions that the events at issue occurred
    on January 4, 2008, and Plaintiffs' claims are therefore not time-
27  barred, as they filed the complaint on December 30, 2009.

28                                    2

Officer Lazoff discharged his TASER Model X26 Electronic Control Device ("ECD") three times into Dr. Rich's chest from a distance of about three to four feet.  (Id. ¶ 16.)  Once Dr. Rich was on the ground, Officer Lazoff turned him into his stomach and discharged the ECD two additional times to Dr. Rich's right thigh.  (Id. ¶¶ 17-18.)  Officer Lazoff was then able to handcuff Dr. Rich with the help of a passerby.  (Id. ¶ 18.)

Officer Lazoff then returned to his patrol vehicle in order to call an ambulance.  (Id. ¶ 20.)  While he was placing the call, the passerby informed Officer Lazoff that Dr. Rich was turning blue. (Id.)  Paramedics arrive shortly thereafter to transport Dr. Rich to Spring Valley Hospital where he was pronounced dead.  (Id. ¶ 21.)

## II. Procedural Background

On December 30, 2009, Plaintiffs filed the complaint (#1) asserting the following five causes of action: (1) Negligence; (2) Strict Product Liability; (3) Intentional Misrepresentation; (4) Fraudulent Concealment and Deceit; and (5) Negligent Misrepresentation.  Defendant TASER filed its answer (#13) on April 26, 2010.

On July 2, 2011, Defendant TASER filed a motion in limine (#50) seeking to exclude the proposed expert testimony of Dr. Jerome Engel.  Plaintiffs responded (#77) on August 8, 2011.  TASER replied (#85) on August 25, 2011.

Also on July 2, 2011, Defendant TASER filed a motion in limine (#51) seeking to exclude the proposed expert testimony of Dr.

1  Michael Wogalter.  Plaintiffs responded (#65) on August 8, 2011.
2  TASER replied (#86) on August 25, 2011.

3      Also on July 2, 2011, Defendant TASER filed a motion in limine
4  (#52) seeking to exclude the proposed expert testimony of Dr.
5  Douglas Zipes.  Plaintiffs responded (#66) on August 8, 2011, and
6  TASER replied (#87) on August 25, 2011.

7      Defendant TASER also filed a motion for summary judgment (#53)
8  on July 2, 2011.  Plaintiffs responded (#67) on August 8, 2011, and
9  TASER replied (#88) on August 25, 2011.

10     TASER filed a supplement to its motion for summary judgment
11 (#91) on October 17, 2011 to which Plaintiffs responded (#92) on
12 October 20, 2011, and TASER replied (#93) on October 24, 2011.

13     TASER filed an additional supplement (#98) to the motion for
14 summary judgment (#53) on December 2, 2011.  Plaintiffs objected
15 (#99) on December 6, 2011, and TASER replied (#101) on December 9,
16 2011.

17     Plaintiffs filed a supplement (#108) to their response (#67) to
18 the motion for summary judgment (#53) on January 18, 2012.  TASER
19 responded (#110) to Plaintiffs' supplemental response (#108) on
20 January 25, 2012, and Plaintiffs replied (#113) on February 13,
21 2012.

22     TASER filed a motion to strike (#109) Plaintiffs' supplemental
23 response (#108) to the motion for summary judgment (#53) on January
24 25, 2012.  Plaintiffs responded (#112) on February 13, 2012, and
25 TASER replied (#115) on February 23, 2012.

28                                 4

1    Plaintiffs filed an additional supplement (#118) to their

2 response (#67) to TASER's motion for summary judgment (#53) on March

3 27, 2012.

4

5                          **III. Legal Standard**

6 **A. The Daubert Standard**

7    Federal Rule of Evidence ("FRE") 702 provides the following:

8       If scientific, technical, or other specialized knowledge
        will assist the trier of fact to understand the evidence
9       or to determine a fact in issue, a witness qualified as an
        expert by knowledge, skill, experience, training or
10      education, may testify thereto in the form of an opinion
        or otherwise.

11
Fᴇᴅ. R. Eᴠɪᴅ. 702.   In Daubert v. Merrell Dow Pharmaceuticals, Inc.,
12
the Supreme Court held that a trial court performs a "gatekeeping
13
role" when performing a Rule 702 analysis, which requires that the
14
court admit only that expert testimony that is both relevant and
15
reliable.  509 U.S. 579, 589 (1993).  Testimony is relevant if it
16
will "assist the trier of fact to understand the evidence or to
17
determine a fact in issue." Fᴇᴅ. R. Eᴠɪᴅ. 702.  That is, the expert
18
testimony must be "tied to the facts of the particular case."
19
Daubert, 509 U.S. at 591.
20
     With regard to scientific knowledge, the trial court initially
21
must determine whether the reasoning or methodology used is
22
scientifically valid and is applied properly to the facts at issue
23
in the trial.  Id. at 589.  To aid the Court in this gatekeeping
24
role, the Supreme Court has identified several key considerations,
25
including (1) whether the theory or method employed by the expert
26
has gained general acceptance in the relevant scientific community;
27

28                                  5

(2) whether the method has been subject to peer-review and publication; (3) whether the method employed can be and has been tested; and (4) whether the known or potential rate of error and the existence and maintenance of standards controlling the technique is acceptable.  Id. At 592-94.  "The four factors enumerated are illustrative rather than exhaustive, and may not be equally applicable in every case.  For example, where an expert has not conducted original research, but is offering an opinion based upon that expert's survey of available literature, the last two factors may not apply at all." Cabrera v. Cordis Corp., 945 F.Supp. 209, 212 (D.Nev. 1996) (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1317 n.4 (9th Cir. 1995)).  For this reason, the trial court has broad discretion in determining whether the Daubert factors reasonably measure reliability in a given case.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999).  The objective of the gatekeeping requirement set forth in Daubert is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

On remand from the Supreme Court, the Ninth Circuit offered further guidance to trial courts:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. . . .
> That an expert testifies based on research he has conducted independent of the litigation provides

important, objective proof that the research comports with the dictates of good science.

Daubert, 945 F.Supp. at 1317.

**B. Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. FED. R. CIV. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the

7

parties may submit evidence in an inadmissible form--namely, depositions, admissions, interrogatory answers, and affidavits--only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  FED. R. CIV. P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary judgment is not proper if material factual issues exist for trial.  B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Disputes over irrelevant or unnecessary facts should not be considered.  Id.  Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law.  Celotex, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole.  Id.

### IV. Defendant TASER's Motions in Limine (## 50, 51, 52)

Defendant TASER's motions in limine seek to exclude at trial the testimony of Plaintiffs' proposed expert witnesses Dr. Jerome Engel, Dr. Michael Wogalter, and Dr. Douglas Zipes.

**A. Dr. Jerome Engel (#50)**

Dr. Engel is a practicing neurologist specializing in the diagnosis and treatment of epilepsy and is presently the Director of the UCLA Seizure Disorder Center.

Dr. Engel testified that he reviewed all of the available medical records, including the pathology report, and the descriptions of the incident on January 4, 2008.  He also reviewed one paper and a chapter from a textbook he edited regarding sudden unexpected/unexplained death in an epileptic person ("SUDEP").  He also engaged in a conversation with a colleague who specializes in the study of sudden infant death syndrome ("SIDS") regarding respiratory versus cardiac arrest as a mechanism precipitating death.

Dr. Rich's report concludes "[i]t is my opinion, to a reasonable degree of medical certainty, that Dr. Rich's death was not in any way related to either the seizure he experienced minutes before, his subsequent postictal state, or SUDEP."  (Def.'s Mot. Summ. J. (#53) Ex. 13.)  However, the Court concludes that Dr. Engel is not qualified to offer expert testimony regarding cause of death, nor is he qualified to offer expert testimony regarding SUDEP. While Dr. Engel is an expert in epilepsy, he has never conducted research on SUDEP or authored articles on the issue.  Further, Dr.

9

1  Engel has never diagnosed a cause of death.  Finally, the Court is
2  not convinced that Dr. Engel is "proposing to testify about matters
3  growing naturally and directly" out of his own work he conducts
4  independent of this litigation.  <u>Daubert</u>, 945 F.Supp. at 1317.
5  Again, Dr. Engel does not engage with SUDEP or diagnosing causes of
6  death in his own research.  For this reason, the Court cannot find
7  that his testimony is reliable, and it must be excluded.

8      Further, the rest of Dr. Engel's proffered expert testimony
9  does not directly present an issue under <u>Daubert</u>.  Dr. Engel's
10 opinions that Dr. Rich had epilepsy and suffered a seizure and
11 subsequent postictal state on January 4, 2008 are undisputed facts
12 in this case, and Dr. Engel's testimony is therefore not helpful to
13 the trier of fact.  As such, Dr. Engel's testimony must be excluded
14 in its entirety.

15 **B. Dr. Michael S. Wogalter, Ph.D. (#51)**

16     Dr. Wogalter is a professor at North Carolina State University
17 and a nationally recognized expert on product warnings and safety.
18 He has a B.A. in Psychology, an M.A. in Human Experimental
19 Psychology, a Ph.D. in Human Factors Psychology, and has published
20 extensively on these topics.

21     Dr. Wogalter's report (#74-2), which he testifies contains the
22 entirety of his opinions in this case, states that his "bottom-line
23 opinion in the present case is that this product's warnings and
24 instructions are defective." (Wogalter Report (#74-2) at 3.)
25 Likewise, Dr. Wogalter's report concludes that

26         the warning system for the TASER Model X26 is defective in
           regards to the risk of inducing cardiac arrest through
27

28                                    10

> darts near the heart.  The defects rendered this product
> unreasonably dangerous such that the defendant in this
> case should not have made it available for sale in the
> condition it was sold.

(Id. at 14.)  As is apparent from this language taken from his

report, Dr. Wogalter is preparing to testify as to ultimate legal

issues that are the province of the jury, namely the adequacy of the

warnings and causation.  "Whether the defendant gave adequate

warnings usually is a jury question."  Neal-Lomax v. Las Vegas

Metro. Police Dept., 574 F.Supp.2d 1193, 1198 (citing Oak Grove

Investors v. Bell & Gossett Co., 668 P.2d 1075, 1080 (Nev. 1983)).

As such, Dr. Wogalter's testimony is not helpful and would only

serve to confuse the jury.

     Dr. Wogalter also offers his opinion of the effects of the

warnings on a user of the device at issue.  (Id. at 10 ("People

expect an adequate warning if there is any real chance that a

product could cause serious injury or death."); see also id. at 11

("The point and belief to be taken from this is that the electrical

current from the X26 is very small and that even with the worst case

scenario, there is no danger.")).  Presumably, the warnings at issue

may be presented to the jury at trial, and the jurors will be able

to assess what "people expect" and what beliefs these warnings

convey based upon their own common sense and human experience.  Dr.

Wogalter's opinion is therefore also unhelpful in this regard.

     Finally, the Court questions the reliability of Dr. Wogalter's

opinion and whether it is sufficiently based on the facts of this

case.  Dr. Wogalter testified at deposition that he was unaware of

what version of the TASER training program was presented to NHP

1 troopers as of January 4, 2008.  In fact, much of Dr. Wogalter's
2 report is dedicated to Version 14 of TASER's training materials,
3 which were not released until after Officer Lazoff's most recent
4 training prior to the incident, while it is undisputed that Officer
5 Lazoff's most recent training was based on Version 13 of TASER's
6 training materials.  That is, Dr. Wogalter does not know what
7 warnings and training material the NHP and Officer Lazoff received.
8 For this reason, he cannot offer a reliable opinion of warnings he
9 cannot identify.

10      For the foregoing reasons, Dr. Wogalter's testimony must be
11 excluded as not helpful and unreliable.

12 **C. Dr. Douglas P. Zipes (#52)**

13      Dr. Zipes is a foremost authority on electrophysiology, a sub-
14 specialty of cardiology that focuses on the electrical impulses that
15 regulate heart rhythm.  He has published extensively on the topic.
16 He received his medical degree cum laude from Harvard Medical School
17 in 1964 and completely his residency in internal medicine and
18 cardiology at Duke University Medical Center.  Dr. Zipes became a
19 full Professor at Indiana University School of Medicine in 1976.  He
20 is on the editorial board of more than fifteen cardiology journals,
21 and was the founding Editor-in-Chief of the Journal of
22 Cardiovascular Electrophysiology and of HeartRhythm, the official
23 journal of the Heart Rhythm Society, which he founded.

24      In his report (#68-2) prepared for this case, Dr. Zipes opines
25 that "to a high degree of medical certainty, the electrical impulses
26 from a Model X26 electrical control device (ECD) manufactured by

27

28                                    12

defendant TASER International, Inc. (TASER) caused the cardiac arrest, and therefore the death, of 33-year-old Ryan Rich, M.D., on January 4, 2008." (Zipes Report (#68-2) at 1.) More specifically, "[a] TASER Model X26 discharge can cause cardiac arrest by capturing the cardiac rhythm at very rapid rates and precipitating ventricular tachycardia or ventricular fibrillation, as shown in animal testing and human reports." (Id. at 53.)

The Court agrees with Plaintiffs that Defendant TASER's objections to the admission of Dr. Zipes' testimony relate more to the weight the jury should give those opinions than to admissibility. While a number of studies contradict Dr. Zipes' assertion the an ECD can cause cardiac arrest in humans, Dr. Zipes has provided a thorough basis for his opinion and also undermined the conclusions of those who disagree with him, mainly by distinguishing other human and animal studies from the situation that occurred in this case. For example, Dr. Zipes notes that he discounts some human tests, many of which are TASER-funded, because human studies are limited by ethical considerations: "human testing must be designed with safety parameters to avoid VF inductions, which eliminates the sort of testing done on pigs, where fibrillation thresholds can be determined." (Id. at 47.) Animal studies also present obvious and non-obvious limitations (animals are tested under general anesthesia for ethical reasons (Id. at 43)) that limit the application to the facts of this case. For these reasons, the Court is not convinced that the number of studies going against Dr. Zipes' opinion, many of them performed by individuals

associated with TASER, mandates that his testimony be excluded.  Nor does the Court find convincing TASER's argument that Dr. Zipes can point to no peer-reviewed study that ECDs causes cardiac arrest in humans.  Also for these reasons, the Court does not object to the anecdotal nature of some of Dr. Zipes' sources.  While TASER accuses Dr. Zipes of "cherry-picking" from the vast literature the few studies that support his conclusion, the Court is satisfied that Dr. Zipes has provided a reliable basis for his opinion that ECDs can indeed cause cardiac arrest in humans and did indeed cause the death of Dr. Rich on January 4, 2008, an opinion which is clearly relevant and helpful to the jury.  TASER will have the opportunity to cross-examine Dr. Zipes and undermine his testimony at trial by providing contradictory evidence.

TASER further objects to the admission of Dr. Zipes' testimony on the basis that he does not address the fact that the presenting, second, and third cardiac rhythm checks on Dr. Rich showed asystole, not VF.  However, Dr. Zipes asserts the following in his report:

> The ECG recorded from the defibrillator pads at Spring Valley Hospital January 4, 2008, shows electrical activity consistent with very fine ventricular fibrillation at the end of the strip labeled 14:49:35 and in the strip labeled 14:49:55.  Probable monitor strips labeled Acuity begin at 14:02:42 are consistent with asystole. . . . So it is likely he developed ventricular fibrillation as the rhythm causing cardiac arrest, which progressed to low amplitude VF (called fine VF) and then asystole as the lack of cardiac perfusion progressed.

(Id. at 14-15.)  The Court is therefore convinced that Dr. Zipes' testimony in this regard fits the facts of the case.  Again, TASER is free to cross-examine Dr. Zipes and/or offer its own expert testimony to contradict his conclusions.

14

1    For the foregoing reasons, the Court finds that Plaintiffs have
2  satisfied their burden of demonstrating the admissibility of Dr.
3  Zipes' expert testimony.

4              **1. Dr. Zipes' Supplemental Report (#108-1)**

5    While the Court denies TASER's motion in limine (#52) to
6  exclude the expert testimony of Dr. Zipes, the Court finds it
7  necessary to address TASER's later motion to strike (#109) Dr.
8  Zipes' Supplemental Report (#108-1).  The Court agrees with
9  Defendant TASER that Dr. Zipe's supplemental report (#108-1) should
10 be stricken.  Expert reports were due to be disclosed on April 26,
11 2011, and discovery closed on June 30, 2011.  The supplemental
12 report is therefore untimely and prejudicial to Defendant TASER, as
13 they have already completed their deposition of Dr. Zipes and
14 discovery is now closed.  Furthermore, while Federal Rule of Civil
15 Procedure 26(e) allows a party to supplement information included in
16 an expert report, the Court finds that Plaintiffs are improperly
17 presenting new opinions under the guise of a "supplement" label.
18 The new report offers Dr. Zipes' opinion of the time period
19 necessary for a VF heart rhythm to degrade to asystole, an issue not
20 at all addressed in his previous report or deposition testimony.

21    This is not the first time Plaintiffs have attempted to obtain
22 additional discovery after the discovery deadline has passed.  On
23 December 6, 2011, the Magistrate Judge granted (#100) TASER's motion
24 to quash (#61) for this very reason.

25    Accordingly, TASER's motion to strike (#109) must be granted.
26 Dr. Zipes' supplemental report (#108-1) is therefore stricken from
27
28                              15

1  the record and the Court does not consider the opinions offered

2  therein.  However, the Court in its discretion will deny TASER's

3  request to impose any further sanction at this juncture.

4

5  **V. Defendant TASER's Motion for Summary Judgment (#53)**

6  **A. Negligence and Strict Products Liability**

7      Plaintiffs seek to hold TASER liable in negligence and strict

8  products liability for failure to adequately warn about the cardiac

9  risks of TASER ECD Model X26 shots to the chest.  To bring a strict

10 products liability claim under Nevada law, a Plaintiff must

11 establish the following elements: "1) the product had a defect which

12 rendered it unreasonably dangerous, 2) the defect existed at the

13 time the product left the manufacturer, and 3) the defect caused the

14 plaintiff's injury." Fyssakis v. Knight Equip. Corp., 826 P.2d 570,

15 571 (Nev. 1992) (citing Ginnis v. Mapes Hotel Corp., 470 P.2d 135

16 (1970)).  "Causation is generally an issue of fact for the jury to

17 resolve." Yamaha Motor Co., U.S.A., v. Arnoult, 955 P.2d 661, 665

18 (Nev. 1998) (citing Nehls v. Leonard, 630 P.2d 258, 260 (Nev.

19 1981)).

20     Nevada law requires that warnings adequately communicate any

21 dangers that may flow from the use or foreseeable misuse of a

22 product.  Fyssakis, 826 P.2d at 572-72.  The Nevada Supreme Court

23 has articulated the conditions under which such liability may be

24 established:

25         Where the defendant has reason to anticipate that danger
          may result from a particular use of his product, and he
26         fails to warn adequately of such a danger, the product
          sold without a warning is in a defective condition.

27

28                                16

1
2
3

> Strict liability may be imposed even where the product is
> faultlessly made, if it was unreasonably dangerous to
> place the product in the hands of the consumer without
> adequate warnings concerning its safe and proper use.

Oak Grove Investors v. Bell & Gossett Co., 668 P.2d 1075, 1080 (Nev.

1983).  "In Nevada, it is well-established law that in strict

product liability failure-to-warn cases, the plaintiff bears the

burden of production and must prove, among other elements, that the

inadequate warning caused his injuries."  Rivera v. Phillip Morris,

Inc., 209 P.3d 271, 273 (Nev. 2009) (rejecting a heeding presumption

as contrary to Nevada law).  The adequacy of the provided warnings

is usually a question for the jury.  Id. (citation omitted).

Plaintiffs' core claim is that TASER manufactured and sold its

X26 ECD without adequate warnings for use.  Plaintiffs argue that

Dr. Rich suffered a cardiac arrest as a result of this failure to

warn.  Specifically, Plaintiffs claim that TASER failed to warn

about the increased risk of cardiac arrest arising from chest shots

and negligently instructed users to target the chest in spite of

TASER's knowledge about the cardiac risks of chest shots.  TASER

argues that the ECD is incapable of causing Dr. Rich's death, that

TASER's warnings were adequate, and that a failure to warn to did

not cause Dr. Rich's death.

**1. Causation**

First, Plaintiff must establish a link between the allegedly

inadequate warning and the resulting injury.  See Rivera, 209 P.3d

at 273.  TASER argues that Plaintiff has produced no evidence that a

different warning would have resulted in a different outcome.

However, viewing the evidence in a light most favorable to

1  Plaintiffs, a reasonable jury could conclude that Officer Lazoff
2  would not have targeted the chest of Dr. Rich had he been warned
3  about the possibility of cardiac arrest and death.  In deposition,
4  Officer Lazoff testified that he was taught to aim the ECD at the
5  "chest area:"

6      Q.   . . . What do you recall specifically being taught
7           about where to aim the device when firing?

8      A.   It was center mass.

9      Q.   Okay.  Center mass is what exactly?

10     A.   I guess, you know, the chest area.

11  (Lazoff Dep. (#70-2) at 65.)  Officer Lazoff further testified that
12  he was not taught that there were any cardiac risks associated with
13  the use of the ECD, nor was he aware of any.  (Id. at 81.)  In fact,
14  Officer Lazoff was presented with pig studies during his training
15  that indicated to him that the ECD was safe.  (Id.)  While Officer
16  Lazoff does not testify directly that he would not have fired an ECD
17  at an individual's chest had he been specifically warned about the
18  risks of cardiac arrest and death, he does gives testimony that
19  gives rise to such an inference:

20     Q.   I know that you have not deployed your TASER since
21           this incident.

22     A.   Yes.

23     Q.   But assuming that you were required to do so because
24           of a certain set of circumstances that you confronted
25           while on duty, would you target the chest?

26     . . .

27

28                                18

1   A.   After going through all this I don't think I'll

2        probably - - if I didn't have - - if it wasn't

3        mandatory that I had to have it on my belt, I

4        wouldn't carry it is I guess the best way to answer

5        that question.

6   Q.   . . . You wouldn't carry a TASER ECD?

7   A.   No.

8   Q.   Why not?

9   A.   I - - I - - having to go through this it is just not

10       worth the risk.

11 (Id. at 247-48.)   Therefore, assuming for now that the ECD was a

12 contributing factor in Dr. Rich's cardiac arrest, Plaintiffs have

13 produced sufficient evidence that a different warning would have

14 resulted in a different outcome.

15      The Court next turns to the issue of proximate causation.  "To

16 establish a prima facie case of negligence or strict tort liability,

17 a plaintiff must satisfy the element of proximate causation."

18 Yamaha Motor Co., 955 P.2d at 664.  That is, "it must appear that

19 the injury was the natural and probable consequence of the

20 negligence or wrongful act, and that it ought to have been foreseen

21 in the light of the attending circumstances."  Crosman v. S. Pac.

22 Co., 173 P. 223, 228 (Nev. 1918).  Defendant TASER argues that

23 Plaintiffs cannot show that ECDs are capable of causing cardiac

24 arrest, nor have they provided evidence that the ECD caused Dr. Rich

25 to go into cardiac arrest in this case.  However, Plaintiffs have

26 produced the expert testimony of Dr. Zipes, as described above.  Dr.

27

28                              19

1  Zipes' testimony is sufficient to establish a genuine issue of
2  material fact as to whether repeated discharges of an ECD into a
3  target's chest can cause VF and/or asystole.  Further, Dr. Zipes'
4  testimony is sufficient to establish that the ECD in fact caused Dr.
5  Rich's cardiac arrest and subsequent death in this case.  Dr. Zipes
6  opined to a reasonable degree of medical certainty that the ECD
7  caused Dr. Rich's death.  Defendants' evidence to the contrary does
8  not eliminate this genuine issue of material fact as to causation,
9  which in any event, is appropriately assigned to the jury.  See
10 Yamaha Motor Co., 955 P.2d at 664 ("Proximate causation is generally
11 an issue of fact for the jury to resolve.") (citing Nehls, 630 P.2d
12 at 260).

13     **2. Reasonableness**

14     Plaintiffs must also produce evidence that "it was unreasonably
15 dangerous to place the product in the hands of the consumer without
16 adequate warnings concerning its safe and proper use."  Oak Grove,
17 668 P.2d at 1080.  In other words, Plaintiffs must show that TASER
18 acted unreasonably in failing to provide appropriate warnings, and
19 that they knew or should have known that their allegedly inadequate
20 warnings created an unreasonably dangerous condition.  See Fontenot
21 v. TASER Int'l, Inc., No. 3:10cv125-RJC-DCK, 2011 WL 2535016, at *10
22 (W.D.N.C. June 27, 2011).

23     TASER first argues that its warnings are adequate because it
24 did not know nor should it have known of an unreasonably dangerous
25 condition.  Under Nevada law, a plaintiff in a duty-to-warn products
26 liability action must demonstrate that a defendant had "reason to
27
28                          20

anticipate that danger may result from a particular use of his product."  Plaintiffs, however, have produced sufficient evidence to raise a genuine issue of material fact as to whether TASER knew or should have known that avoiding discharges to the chest area reduces the risk of cardiac arrhythmias.  For example, Plaintiffs point to a TASER-funded study by electrophysiologists Dhanunjaya Lakkireddy, M.D., and Patrick J. Tchou, M.D., that found that X26 discharges through darts on the front chest of anaesthetized pigs "captured" cardiac rhythm.  (Zipes Report (#68-2) at 38-39.)  The authors published their findings in the peer-reviewed Journal of American College of Cardiology in March, 2006, cautioning that "[a]voidance of this position would greatly reduce any concern for induction of ventricular arrhythmias." (#71-5 at 810.)  On the basis of this evidence alone a jury could reasonably conclude that TASER knew of the cardiac risks of repeated ECD applications to the front chest.

TASER next argues that it is entitled to summary judgment because TASER repeatedly warned against repetitive ECD applications; in other words, TASER argues that its warnings are adequate as a matter of law.  Under Nevada law, "warnings must be (1) designed to reasonably catch the consumer's attention, (2) that the language be comprehensible and give a fair indication of the specific risks attendant to use of the product, and (3) that warnings be of sufficient intensity justified by the magnitude of the risk."  Lewis v. Sea Ray Boats, Inc., 65 P.3d 245, 250 (Nev. 2003).

TASER presents evidence that during his training, Officer Lazoff was warned to avoid extended and repeated ECD applications

where practicable.  Specifically, Version 13 of the TASER training
materials warn, among other things, that "TASER applications
directly across the chest may cause sufficient muscle contractions
to impair normal breathing patterns.  While this is not a
significant concern for short (5 sec) exposure, it may be a more
relevant concern for extended duration or repeated application."
(TASER Ex. 18.)  Another warning provides that "[u]nrelated to TASER
exposure, conditions such as excited delirium, severe exhaustion,
drug intoxication or chronic drug abuse, and/or over exertion from
physical struggle may result in serious injury or death."  (Id.)
This same warning also provides that extended or repeated TASER
exposure may impair a subject's ability to breathe, although
conscious human volunteers continued to breathe during extended
application, and tests on anesthetized pigs did cause cessation of
breathing, "although it is unclear what impact the anesthesia or
other factors may have had on the test results.  Accordingly, it is
advisable to use expedient physical restraint in conjunction with
the TASER device to minimize the overall duration of stress,
exertion, and potential breathing impairment particularly on
individuals exhibiting symptoms of excited delirium and/or
exhaustion."  (Id.)

     Viewing the evidence in a light most favorable to Plaintiffs,
these warnings cannot be said to be adequate as a matter of law.  A
reasonable jury could conclude that they do not adequately warn of
the specific risk of cardiac arrest and death, or that they do not
adequately advise of the risk of aiming at a target's chest.  A

reasonable jury could likewise conclude that these warnings are not of sufficient intensity given the magnitude of the risk.  Further, while other training materials also recommend that a user consider targeting the waist area, Officer Lazoff testified, as noted above, that he was instructed to aim at the chest area, and a reasonable jury could conclude that users should have been explicitly advised to avoid the chest area.  TASER will have the opportunity to argue to a jury that its warnings were not defective, and the jury may agree.  However, the evidence presented here does not permit this Court to find that the warnings are adequate as a matter of law.

For the foregoing reasons, Plaintiffs have produced sufficient evidence of the elements of their products liability claim against Defendant TASER to survive summary judgment.

**B. Plaintiffs' Misrepresentation Claims**

The Court finds that Defendants are entitled to summary judgment on Plaintiffs' third, fourth, and fifth causes of action for the following reasons.

**1. Intentional Misrepresentation**

As their third cause of action for intentional misrepresentation, Plaintiffs claim that Defendant TASER knowingly made false representations to the NHP regarding the ECD at issue that resulted in Dr. Rich's death.  (Compl. ¶¶ 42-43 (#1).) Plaintiffs further allege that the NHP relied upon the misrepresentation, as TASER intended.  (Id. ¶ 43.)  Plaintiffs' claim, however, fails as a matter of law.

The Court finds that Plaintiffs have not alleged and cannot establish the required elements of an intentional misrepresentation claim.  Under Nevada law, Plaintiffs have the burden of proving the following elements:

(1)   A false representation made by the defendant;

(2)   defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation;

(3)   defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and

(4)   damage to the plaintiff as a result of relying on the misrepresentation.

Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1386 (Nev. 1998) (citations omitted), limited on other grounds by Olivero v. Lowe, 995 P.2d 1023 (2000).  Plaintiffs have not alleged and have produced no evidence to establish the third and fourth elements of an intentional misrepresentation claim.  The requisite relationship between a plaintiff and defendant normally found in a claim for intentional misrepresentation is not present in this case.  While Plaintiffs allege that TASER intended to induce the Nevada Highway Patrol to act upon the alleged misrepresentation, they have failed to allege and provide evidence that TASER intended that Dr. Rich rely on the misrepresentation.  Nor have Plaintiffs alleged or offered proof that Dr. Rich did in fact rely on any such misrepresentation.  Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law.  Celotex, 477 U.S. at 323.  TASER is therefore

24

entitled to summary judgment on Plaintiffs' third cause of action for intentional misrepresentation.

### 2. Fraudulent Concealment and Deceit

Plaintiffs allege that Defendant TASER concealed material facts about the ECD that the NHP relied on as intended by TASER. (Compl. ¶¶ 47-50 (#1).) Plaintiffs further allege that they have suffered damages as a result of TASER's concealments. (Id. ¶ 51.) There are five essential elements to a claim for fraudulent concealment under Nevada law:

(1) The defendant must have concealed or suppressed a material fact;

(2) The defendant must have been under a duty to disclose the fact to the plaintiff;

(3) The defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, that is, he must have concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than he would if he knew the fact;

(4) The plaintiff must have been unaware of the fact and would not have acted as if he did if he had known of the concealed or suppressed fact;

(5) And, finally, as a result of the concealment or suppression of the fact, the plaintiff must have sustained damages.

Nev. Power Co. v. Monsanto Co., 891 F.Supp. 1406, 1415 (D.Nev. 1995) (citation omitted).

This claim fails as a matter of law for the same reason Plaintiffs' intentional misrepresentation claim fails. Plaintiffs have not alleged nor have they offered proof on a number of essential elements of their claim. Specifically, Plaintiffs have not alleged and cannot show that TASER intentionally concealed a

1  material fact with the intent to defraud Dr. Rich, nor that TASER
2  induced Dr. Rich to act differently than he would have had he known
3  the allegedly concealed facts.   Plaintiffs have not alleged and
4  cannot show that Dr. Rich would have acted differently if he had
5  known the allegedly suppressed facts about the ECD.   Moreover,
6  because Dr. Rich never purchased a product from Defendant TASER,
7  Plaintiffs cannot establish a duty to disclose as required by the
8  second element of a fraudulent concealment claim.   See also Moretti
9  v. Wyeth, Inc., No. 2:08-cv-00396-JCM-(GWF), 2009 WL 749532, at *3
10 (D.Nev. Mar. 20, 2009) (dismissing fraud by concealment and
11 misrepresentation by omission claims "because Plaintiff never
12 purchased a [product from Defendant], [so] there is no business
13 transaction and Plaintiff's claims fail.").   Because Plaintiffs have
14 failed to allege and offer proof on a number of essential elements
15 of their claim, TASER is entitled to summary judgment.

16    Moreover, "Nevada has expressly rejected the tort in cases such
17 as this, where Plaintiff seeks recovery for personal injuries.
18 Forest, 791 F.supp. At 1470.   The same rational applies to
19 Plaintiff's fraud claims."   Id. at *3 (citing Dow Chem. Co. v.
20 Mahlum, 970 P.2d 98, 110-11 (Nev. 1998)).   In other words,
21 Plaintiffs cannot circumvent the requirements of a wrongful death
22 action by styling their claim as one sounding in fraud.

23          **3. Negligent Misrepresentation**

24    Nevada has adopted the Restatement view of negligent
25 misrepresentation:

26          One who, in the course of his business, profession or
           employment, or in any other transaction in which he has a
27

28                              26

> pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information . . .

Restatement (Second) of Torts § 552(1) (1977).  See Bank of Nev., 616 P.2d 398, 399 (quoting § 552).  As we have previously held, "[i]t is clear from this passage that the tort is only available to those suffering pecuniary injury in the context of a business transaction."  Forest, 791 F.Supp. at 1470.  As such, Plaintiffs have alleged no facts to support a claim of negligent misrepresentation nor could Plaintiffs recover damages for wrongful death.  This claim fails to state a cause of action and we therefore grant summary judgment in favor of Defendant TASER on this issue.

The Court again notes that Plaintiffs cannot eschew the requirements of a products liability action by styling it as one for negligent misrepresentation.  See Foster v. Am. Home Prod. Corp., 29 F.3d 165, 168 (4th Cir. 1994) ("[T]he allegations of negligent misrepresentation are an effort to recover for injuries caused by a product without meeting the requirements the law imposes in products liability actions.").

**C. TASER's Defenses**

**1. The Sophisticated Purchaser/Bulk Supplier Doctrine**

TASER argues that, as a matter of law, it cannot be held liable for not warning the ultimate recipient of the ECD exposure under the bulk supplier or sophisticated user doctrine.  This Court has previously held that

27

1
2
3
4
5

> the relevant question in bulk supplier cases is whether
> the bulk supplier was objectively reasonable in relying on
> a knowledgeable intermediary to provide a warning to
> ultimate users.  This involves proof of two elements: 1)
> that the bulk supplier was reasonable in believing that
> the intermediary knew of the dangers associated with the
> bulk product, and 2) that the bulk supplier was reasonable
> in relying on the intermediary to warn the ultimate users
> of such dangers.

6   Forest, 791 F.Supp. at 1466.  As is apparent from this recitation of

7   the law, the bulk supplier doctrine categorically does not apply to

8   the facts of this case.  Plaintiffs' claims are based on TASER's

9   failure to warn the NHP and Officer Lazoff of the risks associated

10  with prolong exposure to the chest.  TASER does not argue that it

11  relied on the NHP and Officer Lazoff to warn Dr. Rich of the risks

12  ECDs.  TASER's argument that police officers are some sort of

13  learned intermediary that are in a better position to determine the

14  risk of TASER's product than TASER is borders on ridiculous and is

15  belied by TASER's own training and warning materials.  TASER's

16  warnings establish they are not relying on the police officers'

17  expertise regarding the dangers of ECD usage.  Furthermore, as

18  described above, Officer Lazoff was unaware of the cardiac risks

19  associated with ECD discharges to the chest.  As noted by

20  Plaintiffs, this doctrine simply has no bearing on the resolution of

21  this matter.

22              **2. Assumption of Risk/Comparative Negligence**

23       TASER argues that Dr. Rich's assumption of risk bars

24  Plaintiffs' strict liability claim as a matter of law.  "While

25  assumption of risk is no longer a bar to negligence, it is a defense

26  to strict products liability."  Cent. Tel. Co. v. Fixtures Mfg.

27

28                                 28

1  Corp., 738 P.2d 510, 512 (Nev. 1987) (citations omitted).  In order
2  to establish the defense to a claim for strict products liability, a
3  defendant must show "(1) that the plaintiff actually knew and
4  appreciated the particular risk or danger created by the defect, (2)
5  that the plaintiff voluntarily encountered the risk while realizing
6  the danger, and (3) that the plaintiff's decision to voluntarily
7  encounter the known risk was unreasonable."  Id. (citation omitted).
8      While Dr. Rich knew of the dangers of driving given his history
9  of epilepsy and seizures, and he should not have been driving, TASER
10 cannot establish that Dr. Rich was aware of the particular risk
11 created by the allegedly defective ECD, nor can TASER establish that
12 Dr. Rich voluntarily decided to encounter that risk.  The defense
13 does not apply here.
14     With regard to Plaintiffs' claim sounding in negligence, Nevada
15 law provides the following:
16     In any action to recover damages for death or injury to
       persons . . . in which comparative negligence is asserted
17     as a defense, the comparative negligence of the plaintiff
       or the plaintiff's decedent does not bar a recovery if
18     that negligence was not greater than the negligence or
       gross negligence of the parties to the action against whom
19     recovery is sought.
20 Nev. Rev. Stat. § 41.141(1).  In other words, a plaintiff may not
21 recover if the comparative negligence of the plaintiff's decedent is
22 greater than the negligence of the defendant.  Nev. Rev. Stat. §
23 41.141(2)(a).  While TASER argues that no reasonable juror could
24 conclude that Dr. Rich was not more at fault for his death than
25 TASER, the Court finds otherwise.  TASER can present its argument
26 that Dr. Rich is more responsible for his death than TASER to the
27
28                                   29

jury, but with the jury is where this question belongs.  See Thomas
v. Bokelman, 462 P.2d 1020, 1022 (Nev. 1970) ("Courts are reluctant
to grant summary judgment in negligence cases because
foreseeability, duty, proximate cause and reasonableness usually are
questions of fact for the jury.").

### 3. Plaintiff R.J.'s Standing

TASER argues that Plaintiff R.J., the minor child of decedent
Dr. Rich, does not have standing because Plaintiffs have not
asserted a wrongful death action.  TASER's argument in this regard
is completely without merit.  The entire complaint sounds in
wrongful death and the entire action is readily and best
characterized as an action for wrongful death.

However, the Nevada wrongful death statute provides that only
the heirs and personal representatives of the decedent may maintain
such an action.  See NEV. REV. STAT. § 41.085(2) ("When the death of
any person . . . is caused by the wrongful act or neglect of
another, the heirs of the decedent and the personal representatives
of the decedent may each maintain an action for damages against the
person who caused death.").  It is undisputed that seven months
after Dr. Rich's death, before the instigation of this action, R.J.
was adopted by her stepfather.

Because this issue was only briefly addressed in the parties'
motions regarding summary judgment, and because the resolution of
this issue is not necessary to the disposition of the pending
motions, the Court will order the parties to further brief the issue
of whether R.J.'s adoption prior to the filing of the complaint (#1)

30

1  in this case severed her ability to bring a wrongful death action

2  with regard to her natural father, Dr. Rich, pursuant to Nevada law.

3       **D. Punitive Damages**

4       Pursuant to Nevada statutory law, an award of punitive or

5  exemplary damages for the sake of punishing a defendant are only

6  available "where it is proven by clear and convincing evidence that

7  the defendant has been guilty of oppression, fraud or malice,

8  express or implied." Nev. Rev. Stat. § 42.005(1). "Implied malice"

9  is defined as "conduct which is engaged in with a conscious

10 disregard of the rights or safety of others." Nev. Rev. Stat. §

11 42.001(3). Therefore, a plaintiff must show that a defendant

12 subjected him to "cruel and unjust hardship in conscious disregard

13 of his rights." Jeep Corp. v. Murray, 708 P.2d 297, 304 (Nev. 1985)

14 (quotation marks and citation omitted); see also White v. Ford Motor

15 Co., 312 F.3d 998, 1010-11 (9th Cir. 2002) (asserting that a

16 plaintiff must establish that a defendant acted despicably with

17 conscious disregard for his rights). "'Conscious disregard' means

18 the knowledge of the probable harmful consequences of a wrongful act

19 and a willful and deliberate failure to act to avoid those

20 consequences." Nev. Rev. Stat. § 42.001(1).

21      The Court agrees that it cannot conclude as a matter of law

22 that TASER did not act in conscious disregard of the rights or

23 safety of others. While TASER has produced evidence to the

24 contrary, there still remains a genuine issue of material fact when

25 viewing the evidence in light most favorable to Plaintiffs.

26

27

28                                    31

1

## VI. Conclusion

2    While Plaintiffs have failed to establish the reliability and
3 helpfulness of Dr. Engel and Dr. Wogalter, they have successfully
4 established the admissibility of Dr. Zipes' testimony.  Dr. Zipes'
5 opinion that to a reasonable degree of medical certainty Defendant
6 TASER's ECD caused the cardiac arrest and subsequent death of the
7 decedent Dr. Rich is sufficient to create a genuine issue of
8 material fact as to causation.  Furthermore, Plaintiffs have also
9 established genuine issues as to the adequacy of Defendant TASER's
10 warnings and whether different warnings would have resulted in
11 different outcomes.  These issues, along with the question of
12 punitive damages, are questions of fact appropriately left to a
13 jury, which could reasonably agree with either Plaintiffs or
14 Defendant TASER.

15    Meanwhile, Defendants have successfully established that they
16 are entitled to judgment as a matter of law on Plaintiffs' third,
17 fourth, and fifth causes of action sounding in misrepresentation and
18 fraud.  Additionally, the parties are ordered to brief the issue of
19 Plaintiff R.J.'s standing.

20

21    **IT IS, THEREFORE, HEREBY ORDERED** that Defendant TASER's motion
22 in limine (#50) to exclude the testimony of Dr. Jerome Engel is
23 **GRANTED**.

24    **IT IS FURTHER ORDERED** that Defendant TASER's motion in limine
25 (#51) to exclude the testimony of Dr. Michael Wogalter is **GRANTED**.

26

27

28                                    32

1    **IT IS FURTHER ORDERED** that Defendant TASER's motion in limine
2    (#52) to exclude the testimony of Dr. Douglas Zipes is **DENIED**.

3    **IT IS FURTHER ORDERED** that Defendant TASER's motion for summary
4    judgment (#53) is **GRANTED** in part and **DENIED** in part.  The motion is
5    granted as to Plaintiff's third, fourth, and fifth causes of action,
6    and denied with regard to Plaintiff's first and second causes of
7    action.

8    **IT IS FURTHER ORDERED** that Defendant TASER's motion to strike
9    (#109) is **GRANTED**.  Plaintiffs' supplemental report of Dr. Zipes
10   (#108-1) is stricken from the record.

11   **IT IS FURTHER ORDERED** that the parties shall have twenty-one
12   (21) days within which to file contemporaneous memoranda of points
13   and authorities briefing the issue of whether the adoption of
14   Plaintiff R.J., a minor, by her stepfather precludes her from
15   bringing this wrongful death action with regard to her natural
16   father, Dr. Rich.  The parties shall have an additional fourteen
17   (14) days thereafter within which to file their respective
18   responses.  There will be no replies.

19
20
21
22   DATED: March 30, 2012.

                                    _Edward C. Reed._
                                    _____
                                    UNITED STATES DISTRICT JUDGE

28                                    33